UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )    CRIMINAL NO. 04-10004-PBS
            v.                )
                              )
ESSAM MOHAMMED ALMOHANDIS     )

## GOVERNMENT'S MOTION FOR REVOCATION
## OF ORDER OF RELEASE

The government hereby moves, pursuant to 18 U.S.C.

§3145(a)(1), that: (1) this Court revoke the January 13, 2004

Order of the Court (Collings, M.J.) denying the government's

detention motion and releasing defendant Essam Mohammed

Almohandis on conditions; and (2) order Almohandis to be detained

pending further proceedings in this case.  In brief, Almohandis

is charged with carrying an incendiary device on an aircraft, in

violation of 49 U.S.C. §46505(b)(3), and with making false

statements, in violation of 18 U.S.C. § 1001(a)(2).  Under the

facts of this case, no condition or combination of conditions

will reasonably assure the appearance of Almohandis at trial.[1]

Thus, detention is appropriate.

Since Almohandis has no prior criminal history in the United

States, he is in Criminal History Category I.  Based on the facts

currently known to the government, his guideline sentencing

range, about which there is some ambiguity, will run from 0-6

---

[1]      Nor must trial be unreasonably delayed.  On the
contrary, the government believes that in a case such as this, an
immediate trial would be appropriate, and requests that the Court
schedule a trial at its earliest convenience, subject to the
Defendant's rights under 18 U.S.C. § 3161(c)(2).

months to 8-14 months.[2]

Almohandis was stopped and arrested while still in the arrival hall at the international terminal at Logan International Airport. As a result, he is, for purposes of immigration law, still at the border. Thus, he will likely be subject to expedited removal and deported to his native Saudi Arabia almost immediately upon the conclusion of any prison sentence.

The Magistrate Judge denied the government's detention motion and ordered Almohandis released on a $50,000 appearance bond, with $50,000 cash security, and ordered him to live at his home in Riyadh, Saudi Arabia. As argued below, the conditions of release established by the court, including those set forth above and others discussed herein, will not reasonably assure the appearance of Almohandis as required in this case.[3]

## A. **Factual and Procedural Statement**

### 1. **Summary of Evidence**

According to his Saudi Arabian passport (#E715381), and

---

[2]    The ambiguity results from two questions: first, whether under U.S.S.G. §2K1.5(a) and (b)(3), Almohandis could establish that he was carrying the incendiary devices negligently (to date, no facts support that claim); and second, whether under Part 3D of the Sentencing Guidelines, the Title 49 and Title 18 offenses would be grouped together or as separate groups.

[3]"When a district court reviews the findings of a magistrate judge with respect to pre-trial detention, it must engage in a *de novo* review of the contested order." United States v. Marquez, 113 F. Supp. 2d 125, 127 (D. Mass. 2000); see also United States v. Goba, 240 F.Supp.2d 242 (W.D.N.Y. 2003).

2

statements provided to immigration and other law enforcement officials, Defendant Essam Mohammed Almohandis ("Almohandis") is a 33 year old male born in Mecca, Saudi Arabia. He resides in Riyadh, Saudi Arabia with his wife and two children. He is employed as a biomedical engineer at the King Faisal Specialist Hospital in Riyadh.

On January 3, 2004, U.S. Customs and Border Protection ("CBP") Officer Peter Mailloux was on duty at Terminal E at Logan International Airport in Boston. Terminal E serves international flights arriving at Logan. Lufthansa flight 422 from Frankfurt, Germany, arrived at Terminal E at Logan at approximately 12:45 p.m.

Special Agent Wayne Day, an agent with Immigration and Customs Enforcement ("ICE") and currently assigned to the Boston Joint Terrorism Task Force ("JTTF"), has checked passenger records for Lufthansa flight 422. Almohandis was listed as a passenger on that flight. Airline tickets observed in Almohandis's black backpack, discussed below, confirmed that he flew from Riyadh, Saudi Arabia, to Frankfurt on Lufthansa flight 629 on January 3, and from Frankfurt to Boston on Lufthansa flight 422.

CBP Officer Mailloux observed Almohandis in the secondary inspection area of Terminal E at approximately 2:45 p.m. Almohandis told Officer Mailloux, among other things, that he had

3

traveled to the Boston area for business. Almohandis had a black backpack with him ("the backpack"). Officer Mailloux spoke with Almohandis. Almohandis spoke in English. Officer Mailloux observed that Almohandis had no difficulty speaking English. Almohandis did not state he had any trouble understanding or speaking English, spoke English well, and did not ask for any translation services. Almohandis told Officer Mailloux that the back pack was the only luggage he had with him. Airline records confirm that Almohandis had not checked any luggage. Almohandis told Officer Mailloux that he was traveling alone.[4]

Officer Mailloux asked Almohandis if the back pack belonged to him. Almohandis said it did. Officer Mailloux asked Almohandis whether he packed the bag himself. At this time, Almohandis said that he did. Officer Mailloux asked Almohandis whether anyone had given him anything to bring to the United States. Almohandis said that no one had given him anything. Officer Mailloux told Almohandis that he was going to search the

---

[4]     Almohandis apparently did travel alone from Frankfurt to Boston. From Riyadh to Frankfurt, however, Almohandis traveled with another man, Mohammad Al Hayan. Al Hayan also works at the King Faisal Hospital, and was scheduled to attend training in California at a company called Perkin Elmer, a manufacturer of mass spectrometers. At Frankfurt, Al Hayan connected to a separate Lufthansa flight, flight 454, bound for San Francisco. When Al Hayan's flight landed in San Francisco, immigration officials detained him and questioned him regarding his connection to Almohandis. Al Hayan acknowledged that he was a friend and co-worker of Almohandis. He was not found to be carrying any prohibited item on his person. He voluntarily returned to Saudi Arabia on January 5.

backpack.  Almohandis said that that was okay.

Officer Mailloux unzipped the outer pocket of the backpack.
Inside the pocket, beneath other items, Mailloux found three
cylindrical objects, each yellow in color, approximately 1.5
inches long (hereinafter, collectively, "the devices").  Mailloux
found them laying in the bottom of the pocket.  The devices each
appeared to be composed of paper and bore black writing
(subsequent examination of the devices reveals that on each, the
writing reads "K0201").  Officer Mailloux observed that one end
of each of the devices was grayish in color, the other end was
pinkish in color.

Officer Mailloux took one of the objects in his right hand
and asked Almohandis what the object was.  Almohandis stated that
it was an artist's pen.  (At that time, Almohandis did not deny
that the devices were his).  Almohandis then reached toward
Mailloux's right hand.  Mailloux took a step back and told
Almohandis not to reach for anything.  Almohandis stated that he
wanted to show Mailloux how it (the device) wrote and motioned
with his hand in a writing pattern.  Mailloux again asked
Almohandis what the items were.  Almohandis again stated that
they were artist's pens.

At one point, the pinkish end of the device in Mailloux's
hand broke apart from the body of the device, and a black powdery
substance came out of the yellow cylinder.  Mailloux showed the

5

item to Almohandis and asked whether the item was a pen, marker
or crayon.  Almohandis stated it was an artist's crayon.

Supervisory Inspector Michael Cunningham of Customs and
Border Protection joined the interview.  Supervisor Cunningham
took one of the cylindrical objects and asked Almohandis what the
items were.  Almohandis stated they were artist's crayons.

Supervisor Cunningham told Almohandis to cooperate and tell
the officers what the items were.  Almohandis stated he did not
know what they were.  Supervisor Cunningham asked why Almohandis
did not know what they were.  Almohandis stated that his wife may
have put some items in the backpack.  Mailloux asked why
Almohandis told him earlier that he had packed his own bags.
Almohandis did not respond.  Mailloux asked again what the items
were.  Almohandis stated he did not know what they were, but had
seen them around his house previously.  Almohandis stated he
brought the bag to the desert.  Mailloux asked why Almohandis
would need the devices in the desert.  Almohandis stated that he
did not know they were in the bag.

Massachusetts State Trooper Timothy R. Murray was called to
examine the devices.  Trooper Murray is trained as a bomb
technician with the Massachusetts State Police, has served in
that capacity for approximately seven years, and is assigned to
Logan International Airport as a hazardous devices technician.
Over the last seven years, Trooper Murray has participated in the

6

used, or how they got into the backpack.

At approximately 7:30 P.m. on January 3, 2004, Federal Bureau of Investigation Special Agent Michael McCall and FBI JTTF members Special Agent Edmond Cronin and Massachusetts State Trooper William Barrett interviewed Almohandis at Logan International Airport.  The agent and trooper each introduced himself.  Almohandis was read his rights from an FBI Advice of Rights form.  Almohandis also read the form himself, aloud, in English.  Almohandis spoke English clearly (Almohandis later explained that he speaks English well because in the hospital in which he works, English is the primary language and that it was essential to speak English well).  Almohandis waived his rights and spoke with the agents.  In the interview, Almohandis said, in part, that his travel started at his residence in Riyadh, where he said his wife packed his back pack.  Almohandis stated that he did not go through the back pack for the trip and relied on his wife to pack for him, which she had done two days prior to Almohandis's departure.  Almohandis stated that he had no idea how the artist's pen or crayons (the devices) could have gotten into the bag.  Almohandis stated that he did not put them there and did not recognize them.  Almohandis also stated that no one other than his wife had access to the backpack, but that he was confident his wife did not put the devices into the backpack. Almohandis also stated that neither he nor his wife had the

9

ability or a source to obtain the devices.   When the agents
explained that the items were incendiary devices, Almohandis
could not explain why he initially tried to describe them as
artist's crayons or pens.   Almohandis also stated that it is
illegal to possess incendiary devices in Saudi Arabia.

According to Almohandis, he was coming to the United States
to receive training at MJ Research in Waltham, Massachusetts from
January 5-9, 2004.[6]   MJ Research has confirmed that information.
Almohandis had reservations to stay at Summerfield Suites in
Waltham, Massachusetts.   There are certain discrepancies in the
hotel reservations.   Most significantly, the reservations
Almohandis had on his person were in the name of Mohammed Al-

---

[6]     Perry Hamerla, a service manager for MJ Research, was
interviewed on January 4, 2004 by FBI Special Agent Gregory
Comcowich and Massachusetts State Trooper Kathy Freeman.   Among
his responsibilities, Hamerla issues so-called "visa letters" to
foreign nationals requiring a visa so that the foreign nationals
can demonstrate to the Department of State that they are coming
to the United States legitimately for training.   Hamerla stated
that Almohandis and another man employed at the King Faisal
Specialist Hospital, Mohammad Hamad Almohethef, first requested
training in October 2003 through a man named Tariq Azzawe, who
works for International Labs, a Phoenix, Arizona-based
distributor for MJ Research.   The two men sought training that
was scheduled to begin on December 8, 2003.   Hamerla believes he
initially sent visa letters to Almohandis and Almohethef in
October.   Almohandis made what Hamerla characterized as repeated
and determined efforts to obtain a visa in order to travel on
December 6, 2003.   On December 6, 2003, Hamerla was requested by
Almohandis to expedite a visa letter vouching that the training
was taking place, so that Almohandis could get a visa and fly to
the United States the same day, that is, December 6.   Hamerla
told the agent and trooper that it was the only time he could
recall where he felt pressured to get a visa letter for a
particular date for an individual seeking training.

10

Jilani.  When questioned about this discrepancy, Almohandis told
Special Agents of the F.B.I. that Al-Jilani was originally
supposed to go to the training, but encountered difficulties in
obtaining a visa.  Almohandis stated that he was designated to
attend the training in place of Al-Jilani.  A records check by
the Department of State, however, indicated that Almohandis
received his visa at the United States Embassy in Riyadh on or
about December 7, 2003, and Al-Jilani did not even apply for a
visa at the Embassy until December 30, 2003.  Summerfield
Suites's records indicate that Al Jilani was not added to the
reservation until December 31, 2003, and that Al Jilani and
Almohandis were scheduled to share a room.

     Almohandis was again interviewed on January 4, 2004 by
Special Agent Edmund Cronin and Massachusetts State Trooper
William Barrett.  He waived his rights orally and in writing.
During this interview, Almohandis told the agent and trooper that
he believed someone must have put the items in his bag at some
point during either the Riyadh to Frankfurt or Frankfurt to
Boston flight.

  **2.   Procedural History**

     Almohandis was arrested on January 3, 2004, and permission
to lodge was granted by Magistrate Judge Robert B. Collings the
same day.  A criminal complaint was lodged on January 5, charging
Almohandis with carrying an incendiary device on an aircraft, in

violation of 49 U.S.C. §46505(b)(3), and with making false statements, in violation of 18 U.S.C. § 1001(a)(2). Almohandis had his initial appearance before Magistrate Judge Collings on January 5. The government moved to detain Almohandis under 18 U.S.C. §3142(f)(1)(A) (crime of violence) and (f)(2)(A) (risk of flight), and sought a three-day continuance. On January 8, Judge Collings conducted a preliminary examination/detention hearing. The government called Special Agent Day, the affiant for the complaint, as its only witness. Following cross-examination by the defense, the Court found probable cause as to both counts. The defense then requested a continuance to gather evidence to counter the government's contention that Almohandis presented a substantial risk of flight.

On January 9, the defense submitted several letters from friends and family members of Almohandis in Saudi Arabia purporting to attest to his good character. The defense's investigator testified to having substantially the same conversations by telephone with persons in Saudi Arabia regarding Almohandis. The defense also introduced documentary evidence substantiating Almohandis's registration for the training in Waltham and his employment at King Faisal Specialist Hospital.

The defense argued that Almohandis should be released on conditions to await trial in Saudi Arabia. Defendant's counsel stated that she was in the process of gathering $50,000.00 in

12

security from Almohandis's family and friends, and further
represented that she was attempting to get a guarantee from the
Kingdom of Saudi Arabia that if Almohandis were returned to Saudi
Arabia, the Saudi government would take whatever steps were
necessary to insure that he returned to this Court as required.

The government expressed its belief that the Government of
Saudi Arabia could not make such an agreement in the absence of
an extradition treaty or other, similar provision of Saudi or
international law.

The Court continued the hearing until January 13, 2004, and
directed defense counsel to see if the funds would be made
available as security, and directed the government to confirm
with the Department of Justice's Office of International Affairs
in the Criminal Division, and other appropriate entities, as to
whether such a guarantee could be given by the Saudi government.

At the continued hearing on the morning of January 13, 2004,
defense counsel reported to the Court that the $50,000 had been
secured from Saudi Arabia, but acknowledged that no agreement or
guarantee had been obtained from the government of Saudi Arabia.
The government argued that $50,000 was not sufficient security to
reasonably assure the Court that Almohandis would return for the
appearances, and further noted that it was not even certain that
he would be readmitted to the country once removed from it, even
for purposes of prosecution.  The government further stated that

13

the Department of Justice's Office of International Affairs, the
Legal Advisor's Office and Saudi Desk at the Department of State,
and the U.S. Embassy in Riyadh all shared the view that there was
no bilateral extradition treaty between the United States and
Saudi Arabia, no provision of Saudi law, and no international
covenant which would give the Government of Saudi Arabia the
authority to compel Almohandis to return to the United States for
future Court appearances.

The Court took the matter under advisement, and directed the
parties to appear before it at 3:30 p.m. on January 13, 2004.

At approximately 2:30 p.m., a Grand Jury returned a two-
count Indictment against Almohandis, charging him with violations
of 49 U.S.C. § 46505(b)(3) and 18 U.S.C. § 1001(a)(2).

At 3:30 p.m., Almohandis was arraigned on the Indictment,
pleading not guilty to each count.  The Court then ordered him
released on the following conditions:

1.       The defendant shall promise on the record in open
         Court that he will return from Saudi Arabia for
         any proceedings in this case in which his presence
         is required and that he will cooperate fully with
         the Governments of the United States and Saudi
         Arabia in any proceedings undertaken to effectuate
         his return to the United States to stand trial.[7]

─────────────

        [7]      In a footnote to this condition, the Court indicated
that "[t]he Convention for the Suppression of Unlawful Acts
against the Safety of Civil Aviation may be applicable to the
instant case.  The Convention was concluded on September 23, 1971
and both the United States and Saudi Arabia are signatories."
The Court indicated that a copy of that Convention, provided to
it by defense counsel, would be made part of the record.  The

14

2.      The defendant shall sign a $50,000 bond secured by
        the deposit of $50,000 cash into the Registry of
        the Court.

3.      Upon his return to Saudi Arabia, the defendant
        shall maintain his current residential address and
        not move from that address without obtaining
        advance permission from the Court.

4.      The defendant shall telephone Pre-Trial Services
        before 4:00 P.M. (Eastern Time) on every
        Wednesday.  Alternatively, if can [sic] be
        arranged, Pre-Trial Services may, either in
        addition to or in lieu of telephone contact,
        require that the defendant report on a weekly
        basis to a specified officer at the American
        Embassy in Riyadh.

5.      Upon his return to Saudi Arabia, the defendant
        shall turn in his passport to the United States
        Embassy in Riyadh.

6.      The defendant shall maintain his employment while
        on release.

7.      The defendant shall not commit any crimes while on
        release.

8.      The defendant may not possess any firearms,
        destructive devices or dangerous weapons while on
        release, and there shall be none in his residence.

9.      The defendant shall not travel outside Saudi
        Arabia except for the purpose of returning to the
        United States for proceedings in this case.

    The Court further ordered that prior to Almohandis's return

to the United States for proceedings in the case, the Court would

convene a hearing to set conditions of release applicable while

---

Office of International Affairs at DOJ and the State Department's
Office of Legal Advisor are in agreement that the Convention does
not cover a violation of 49 U.S.C. 46505(b)(3) under the facts
presented in this case.

15

he was in the United States.

**B.    Almohandis Is An Obvious And Significant Flight Risk -- No Set Of Conditions Can Reasonably Assure His Presence As Required In This Case.**

Almohandis is subject to an indictment in this case that calls for up to 14 months' imprisonment on the facts now known to the government.[8]  The weight of evidence in support of the indictment is very strong, and as to the false statements count is overwhelming.   The likelihood that he will be immediately deported from the United States upon completion of any period of incarceration imposed in this case is as close to 100% as is possible.

If Almohandis is released on conditions, he will face a choice.  First, he can comply with the conditions and travel from Saudi Arabia, apparently at his own expense, to appear as required at all future proceedings.  Following trial, he will be deported to Saudi Arabia immediately after the conclusion of any further prison sentence imposed.  Or, second, he can violate his conditions and refuse to return from Saudi Arabia in order to avoid both any prison term and certain deportation back to Saudi

---

[8]    While the government acknowledges that if Almohandis could establish that his carrying the incendiary devices was negligent, at least following a plea, he could be subject to as low as a 0-6 month sentencing range.  He bears the burden of making that showing.  Almohandis has not provided any evidence to support that claim.  Indeed, his seriatim inconsistent statements about the devices must be weighed against whatever such claim of negligence he advances.

16

Arabia.  If he simply remains in Saudi Arabia, there is
absolutely nothing the Government of the United States can do to
compel his return.

The court below imposed nine conditions of release to
address the risk that Almohandis will refuse to return to the
United States to face this prosecution.  The only condition of
practical significance is condition number 2, the posting of a
$50,000 secured bond.  Almohandis, or apparently his family and
friends, would lose that bond were he to fail to return.
The government argues that that condition is simply inadequate to
reasonably assure his presence at all future proceedings in this
case.

Knowing nothing about the people who raised the funds for
the security, including their financial circumstances, the
government acknowledges that $50,000 is, in the abstract, not an
insignificant amount of money.  It is, however, not nearly
sufficient to overcome Almohandis's otherwise overwhelming
incentive to get out of the United States as quickly as possible
and not return.  He has no acknowledged contacts in the United
States absent the training he was coming to attend; he faces the
real prospect of a prison sentence if convicted, even if brief;
and deportation will follow in any event.

Given what would be understandable human reactions to
Almohandis's plight, it is not surprising that Almohandis's

family and friends would be willing to lose a sum of money to give their son/brother/friend a chance to escape a criminal justice trial and sentence.  Monetary security can only assure a defendant's appearance if its loss would be so difficult to the posters of the money that it can fairly be said that no reasonable defendant would subject third-parties to that loss. Here, however, we are not talking about a surety losing a home. We are only talking about money; money posted by people who, instead of encouraging compliance with his conditions of release, could well encourage Almohandis to absent himself from further proceedings, and willingly suffer the monetary lose in exchange for their son's/brother's/friend's freedom.  The money was posted quite quickly, suggesting that it was readily available to whoever posted it, and thus quite possibly not greatly missed. More importantly, Almohandis could flee even if his flight is not encouraged by his sureties.  Even if his sureties are not willing to lose their posted cash, Almohandis can flee with or without the intention of paying them back after he returns to Saudi Arabia.  Assuming he believes the posted cash is important to the sureties, he also knows that it came out of savings.  The offered security in this case, $50,000 cash, offers no strong disincentive to flight.  In effect, it is a price that many, if not most families, would be willing to pay to avoid having Almohandis face the consequences that this case presents.  It is

18

also a price that Almohandis might be willing to impose on others (without their consent) for relief from those consequences.

As to the remaining eight conditions, they are not conditions which have any meaningful effect.

As to the requirement that Almohandis promise to return from Saudi Arabia for future proceedings, the promise can simply be given, then broken. Beyond forfeiture of the $50,000, there is no legal remedy available to the government and the Court if the Order is simply ignored.

The court below has required that Almohandis maintain his residence and employment. There is no basis for enforcement of these conditions.

The court will require Almohandis to surrender his passport to the U.S. Embassy in Riyadh. The Office of the Legal Advisor for the State Department takes the position that the passport is the property of the Saudi government, not the property of the U.S. government, and that it has no right to maintain custody of the passport in connection with this criminal matter. Nor does the State Department believe it would be appropriate to have Almohandis report to the Embassy in person. Further, even if Almohandis were to turn his passport into the U.S. Embassy, he could simply apply for another Saudi passport.

In short, other than the posted bond, the conditions of release have no legal effect.

19

In May 2001, the District Court in the Eastern District of Pennsylvania was confronted with a very similar situation. United States v. Epstein, 155 F.Supp.2d 323 (E.D. Pa. 2001). The defendant, a dual citizen of Germany and Brazil, and a resident of Brazil, was suspected of committing wire fraud against his Pennsylvania employer. When he arrived in the United States at Miami Airport, he was placed under arrest, apparently on a complaint. Id. at 324. At a pre-trial detention hearing, a Magistrate Judge in the Southern District of Florida ordered the defendant released on conditions. The magistrate judge stayed the release order to allow the defendant to be transferred to Philadelphia pursuant to Rule 40, and so that the government could seek review of the release order. Id.

Although the defendant lived in Brazil with his wife and four young children, he and his wife owned two condominiums and other assets in South Florida worth approximately $1,000,000. He had no prior criminal history. Otherwise, he did not have ties to the United States, other than the fact that his employer was based outside of Philadelphia. Id.

The magistrate judge's release order required the defendant to execute a $1,000,000 bond, secured in part by the two Florida properties. Further, he was ordered to report to Pre-Trial Services daily (presumably in the Southern District of Florida), and was to be electronically monitored from 6:00 p.m. until 6:00

a.m. daily.   Id.

Recognizing that the defendant had substantial property in
the United States which was posted as security, had residences in
the United States, no criminal history, and that the crime
charged was neither violent nor involved drugs, the District
Court ordered him detained:

> Most significant is his lack of ties to the United
> States.  While he and his wife own two condominiums in
> the Miami area and have other assets in this country
> worth about $1 million, they and their children, as
> well as other family members, are permanent residents
> of Brazil.  He has property there with at least four
> times the value of his property here.  He also makes a
> sizable salary at a company located there.   In
> addition, the United States and Brazil have no
> extradition treaty.  If he were to flee to his
> homeland, there is virtually no chance that he could
> ever be brought to justice in the United States.

Id. at 325-26.  The District Court was unpersuaded by the
defense's argument that the prospect of a short prison sentence
(37 to 46 months, or possibly as low as 24 months) was such that
the defendant would not be tempted to abscond.   Id. at 326.

The District Court continued:

> The crucial factor, however, is defendant's lack
> of ties to the United States and his extensive ties to
> Brazil with which no extradition treaty exists.   In our
> view, his forfeiture of $1 million worth of assets in
> the United States would not deter him from flight when
> in Brazil he has significant wealth, a lucrative job,
> the presence of his family, and insulation from ever
> being forced to stand trial.

Id.  By comparison to Almohandis, the defendant in Epstein's ties
to the United States were extensive.  The government acknowledges

that based on the facts currently known to it, Almohandis faces
an even shorter potential sentence than that faced by Epstein.
On the other hand, his ties to the United States are non-existent
with the exception of the training he was to receive during the
week of January 5-9, 2004.  The $50,000 security, while not
inconsequential, is a very modest sum for a professional engineer
with family and friends able to raise that sum over the course of
a few days.  As it is the only condition that is legally
enforceable, and because release from the Marshal's custody will
almost certainly result in Almohandis removal to a country with
which the United States has no extradition treaty, the Court
cannot conclude that Almohandis will have any motivation to
return to the United States to face trial.

### C.    The Government Requests An Immediate Trial.

Rather than release Almohandis to live in Saudi Arabia, the
government believes the case can be prepared for trial almost
immediately.  This would assure that, in any event, Almohandis is
not kept in the United States beyond even a 0-6 month period, and
avert the overwhelming risk that Almohandis will simply ignore
the Court's Order and refuse to return from Saudi Arabia.
Accordingly, the government requests a trial at the earliest
point convenient to the Court's calendar, subject to Almohandis's
rights pursuant to 18 U.S.C. § 3161(c)(2).

## CONCLUSION

Wherefore, the government respectfully moves this Court to vacate The Magistrate Judge's Release Order issued on August 13, 2004, and to order Defendant Essam Mohammed Almohandis detained pending further proceedings in this matter.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _____
GREGORY MOFFATT
BRIAN T. KELLY
Assistant U.S. Attorneys
(617) 748-3370

January 15, 2004

### CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by telecopier, hand delivery and by electronic mail:

Miriam Conrad, Esq.
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA 02210

This 15th day of January 2004.

_____
GREGORY MOFFATT
ASSISTANT UNITED STATES ATTORNEY

23