UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10004-PBS |
| | ) | |
| ESSAM ALMOHANDIS | ) | |

## OPPOSITION TO GOVERNMENT'S MOTION
## FOR REVOCATION OF RELEASE ORDER

Defendant, Essam AlMohandis, submits this memorandum in

opposition to the Government's Motion for Revocation of Release

Order ("Government's Motion") to revoke the release order entered

by Magistrate-Judge Robert B. Collings.

### STATEMENT OF FACTS

Mr. AlMohandis, who is 33 years old, has worked for eight

years at a research hospital in Riyadh, Saudi Arabia as a

biomedical engineer. He is married and has two children:

a boy, aged 2 years and 9 months, and a girl who was only one

week old when Mr. AlMohandis flew to the United States to attend

a technical training program at MJ Research in Waltham. He had a

valid B-1 visa for the trip.[1]

---

[1] Mr. ALMOHANDIS had rescheduled his trip from December to
January because he did not receive his visa in time to attend the
December program. The Government's Motion attempts to portray
Mr. AlMohandis' efforts to obtain a visa before his originally
scheduled departure as somehow unusual. Perry Hamerla, the
service manager at MJ Research, has told undersigned counsel that
the account provided by the government "distorted" what Mr.
Hamerla told the FBI during an interview. Mr. Hamerla told
undersigned counsel that he did not feel "pressured" to expedite

When Mr. AlMohandis arrived at Logan International Airport on January 3, 2004, a customs inspector found three small items, described as "firecracker-like" devices, in the outer pocket of his backpack. According to the customs inspector, when Mr. AlMohandis was asked what the devices were (while the inspector held the items in his hand), he said they were artists' pens or crayons. After the tip broke off of one, revealing a black powder inside, he said that he didn't know what they were. 1/8 Tr. 44-45. He later said they <u>looked</u> like crayons. <u>Id</u>. During the probable cause hearing in this matter, a sketch artist for a local television station loaned defense counsel her tray of crayons. At least one of them was the approximate size as the items seized from Mr. AlMohandis' backpack and, other than in color, looked strikingly similar.

---

a visa request letter -- which in fact had been sent well before December. Nor did he feel that Mr. AlMohandis' efforts to obtain a visa were out of proportion to the difficulties and delays that he encountered. In fact, those delays resulted in Mr. AlMohandis having to reschedule his trip at the last minute. Since his interview by the FBI, Mr. Hamerla — who had returned from a two-week vacation on the same day that he was interviewed by the FBI — has reviewed correspondence regarding Mr. AlMohandis' visa. These reflect no direct contact between Mr. AlMohandis and Mr. Hamerla. Furthermore, the government's claims regarding Mohammed Al-Jilani's planned trip omits the fact that Al-Jilani was in contact with MJ Research about his planned January trip as early as November — when Mr. AlMohandis was attempting to arrange <u>his</u> trip for December.

During questioning by agents – first customs, then immigration, and later by the FBI — Mr. AlMohandis provided personal information about his employment, his home address, his education, even his e-mail addresses. 1/8: 46-48. Mr. AlMohandis also provided detailed information about his trip to the U.S. This included the name and itinerary of a colleague who had flown with him from Riyadh to Frankfurt, where the two men parted company in order to change planes for their ultimate destinations. 1/8: 21-22. The co-worker, who was "very cooperative" when interviewed by agents at the San Francisco airport, corroborated Mr. AlMohandis' information and "indicated that [the defendant] had no animosity toward the United States." 1/8: 23-24.[2]

Evidence at the hearing showed that Mr. AlMohandis never had attempted to use the devices in question before, during of after

---

[2] The Government's Motion asserts that the co-worker, Mohammed Al-Hayan "voluntarily returned to Saudi Arabia on January 5." Government's Motion at 4 n.4. According to a report provided by the government (attached hereto as Exhibit A), after agents interviewed Mr. AlHayan at the San Francisco Airport, Passport Control at the San Francisco Airport was instructed to refuse to allow Mr. Al-Hayan to enter the U.S. "for association with AlMohandis." If it is true that Mr. Al Hayan left the U.S. on January 5 – the same day that he was to begin a 9-day training program – it appears that he did so only after being told that he would not be allowed to enter the U.S.

the flight.  1/8:16.  During the flight, his backpack was in a
storage bin several rows away from his seat.  1/6: 15.

A bomb technician "tested" the device by putting a lit match
to the tip and to the powder contained inside the item.  1/8: 31-
32.  It emitted some sparks, but did not explode, start a fire,
or injure the technician.  Id.

The personal information provided by Mr. AlMohandis to
Pretrial Services has been verified by his brother, Yousef, and
his employer, Nasser Qahtani.  1/9: 14-16.  The information
included his age, employment, address, family, marital history,
and financial circumstances.  Friends and relatives have
submitted letters to the court attesting to Mr. AlMohandis' good
character, reliability, and lack of animosity toward the United
States.  The Magistrate-Judge found that Mr. AlMohandis "has a
reputation in his community of being a hard-working peace-loving
man of integrity.  He appears to harbor no ill will toward the
United States."  Order at 2.

During the detention hearing, the government dropped its
request for detention based on danger.  1/9:24.  Government
counsel acknowledged that, if Mr. AlMohandis were a U.S. citizen
living in this country, there would be "absolutely no question"
that he would be out on bail.  1/9: 28.

-4-

ARGUMENT

Defendant submits that the conditions set by the Magistrate-Judge are more than sufficient to reasonably assure the defendant's return to court as required.

I.   THE COURT SHOULD STRIKE THE FACTUAL CLAIMS FOR WHICH THE GOVERNMENT HAS OFFERED NO EVIDENTIARY SUPPORT.

The Government's Motion asserts "facts" never presented during the detention or probable cause hearing and unsupported by any evidentiary showing, in an apparent attempt to cast a cloud of insinuations over Mr. AlMohandis.  These include a lengthy discussion of claimed "discrepancies" in the hotel reservations.  The "discrepancies" are based on a distorted account of the delays encountered by the three Saudis who were trying to arrange visits to receive training at MJ Research.  We contend that any purported "discrepancies" are irrelevant.  They appear to be a perfectly understandable result of confusion resulting from the various visa difficulties.  We submit that this court should strike the paragraph beginning on page 10 and continuing on to page 11 (along with footnote 6) of the Government's Motion.  The court should not consider these claims unless and until the government presents evidence regarding them and defense counsel has an opportunity to cross-examine the government's witness(es) and, if necessary, present witnesses to refute their claims.

II.  THE CONDITIONS SET ARE MORE THAN SUFFICIENT TO REASONABLY
     ASSURE MR. ALMOHANDIS' APPEARANCE.

     The Government's Motion relies primarily on two unsupported

assertions.  First, the government argues that the proffered

$50,000 cash bail is insufficient to reasonably assure Mr.

AlMohandis' return.  This argument rests on rank speculation and

pure supposition:  "The money was posted quite quickly,

suggesting that it was readily available to whoever posted it,

and thus quite possibly not greatly missed."  Government's Motion

at 18.  Nothing could be further from the truth.  Mr. AlMohandis'

brother, Yousef, has told undersigned counsel that he posted

approximately $31,000 himself.  This money represents his life

savings.  Yousef AlMohandis earns approximately $33,000 a year as

an employee of the Ministry of the Interior.  Two cousins

contributed aproximately $5,300, and Yousef AlMohandis borrowed

the balance from a friend.  Thus, Yousef AlMohandis was willing

to put up his entire life savings -- an amount that represents

nearly one year's salary -- and go into debt in order to assure

his brother's return to court.  The government offers no basis

for its assertion that the defendant's brother "could well

encourage AlMohandis to absent himself," nor does it explain why

the loss of the bail would be less significant to a Saudi Arabian

than it would be to an American.  Surely $50,000 would be more

than adequate bail to reasonably assure the appearance of an
American citizen with no prior record in a case carrying a
possible sentencing range after trial of 0-6 months.  The
government's reliance on deportation as a possible consequence of
conviction should carry no weight.  This is not a case in which
deportation (or, in this case, removal) would have the
devastating consequence of separating a defendant from his home
and loved ones.

The government's second argument is that "there is
absolutely nothing the Government of the United States can do to
compel his return."  Government's Motion at 17.  This ignores the
existence of the "Convention for the Suppression of Unlawful Acts
against the Safety of Civil Aviation," (Montreal 1971) to which
both Saudi Arabia and the United States are signatories.  That
Convention (which was made part of the record in the proceedings
before Magistrate-Judge Collings and is attached hereto as
Exhibit B) applies to anyone who "unlawfully and intentionally .
. . places or causes to be placed on an aircraft in service, by
any means whatsoever, a device or substance which is likely to .
. . cause damage [to the aircraft] which is likely to endanger
its safety in flight."  Article I, ¶ 1(c).[3]

_____

[3] The government has represented that the Office of
International Affairs at DOJ and the State Department's Office of

The Saudi Constitution, known as the Basic Law, provides:
"Statutes and international agreements shall define the rules and
procedures governing the extradition of common criminals."
Article 42, Basic Law of the Kingdom of Saudi Arabia.  This
provision of Saudi law does not, on its face, require an
extradition treaty, to support extradition; it includes
agreements and statutes as well.

The Montreal Convention provides that signatories that do
not require extradition treaties "shall recognize the offences as
extraditable offenses between themselves subject to the
conditions provided by the law of the requested State."  Article
8, ¶ 3 (emphasis added).

Even if the Saudi constitution is read to require an
extradition treaty, the Convention further provides that such
countries may treat a request for extradition from another
signatory, with whom it has no extradition treaty, as providing a
"legal basis for extradition[.]"  Article 8, ¶ 2.  Finally, the
convention requires a signatory that refuses to extradite

---

Legal Adviser "are in agreement that the Convention does not
cover a violation of 49 U.S.C. 46505(b)(3) under the facts of
this case."  Government's Motion at 14-15 n.7.  During a
conference call, in which government counsel participated,
representatives of those two offices stated that the
determination regarding the applicability of the treaty to the
instant offense was, at least in the first instance, made by the
individual prosecutor.

"without exception whatsoever and whether or not the offense was committed in its territory, to submit the case to its competent authorities for the purpose of prosecution." Article 7. Thus, even if the Saudi constitution could be read to require extradition treaties, and even if the Saudis refused to treat the Convention as legal authority for extradition in this case, the Saudi government would be required, under the convention, to prosecute AlMohandis in Saudi Arabia. Indeed, such a prosecution would be permitted in Saudi Arabia, even absent the Convention, since any Saudi citizen who commits a crime outside Saudi Arabia can be prosecuted for that crime in Saudi Arabia, as long as it is a crime under Saudi law.

The government's insistence that it has no means of securing Mr. AlMohandis' appearance for trial ignores statements made by the Department of Justice in readily available publications. For example, a DOJ report entitled, <u>Terrorism in the United States</u> (1997), excerpt attached hereto as Exhibit C, contains the following discussion under the heading, "The Long Arm of the Law":

> The general term rendition encompasses the formal process of extradition through a treaty. Irregular renditions, however, occur outside the parameters of extradition treaties. Frequently, the practice is borne of frustration at either the pace of the extradition process or the unwillingness of a country with whom the United States has a valid extradition

> treaty to render an individual to the United States to
> face trial. <u>On some occasions, however, both
> governments will agree to bypass the formal extradition
> process to expedite an individual's removal to the
> United States to stand trial.</u>
>
> Irregular rendition devices fall into three categories:
> the abduction of an individual from one nation by
> agents of another nation, <u>the informal surrender of an
> individual by one nation to another without formal or
> legal process</u>, or the use of immigration laws to expel
> an accused or convicted criminal from a country.

Report at 15 (emphasis added).

There does appear to be an arguably applicable agreement between the countries; there does not appear to be any reason why the Saudi government could not agree to guarantee his return; and the government's own publications acknowledge the availability of other means of securing foreign defendants' appearance at trial. Certainly the Saudi government could agree not to issue him a new passport.

The <u>Epstein</u> case is inapposite. The defendant in that case was a man of great wealth facing substantial imprisonment. In contrast, this case is one in which, <u>even if convicted at trial</u>, the defendant may fall into a guideline range of 0-6 months. The base offense level for the incendiary device charge is 9, with a possible reduction of three levels for "negligent" possession of the devices. The base offense level for the false statement charge is 6. Thus, after trial, a reduction for negligent

possession would result in a range of 0-6 months, even if the counts are not grouped together.  On a plea, even <u>without</u> the reduction for negligent possession, the range would be 0-6 months, if the charges are grouped together.

Detention of Mr. AlMohandis would be likely to coerce a plea.  It is quite possible that the financial and personal burden of remaining in the U.S. - especially under the onerous restriction of 24-hour house arrest - would have the same effect.

Contrary to the government's assertion, the evidence is neither "very strong" nor "overwhelming."  Judge Collings described the case as one involving triable issues.  We submit that there are substantial issues and defenses in this case. These include, as to count one, the interpretation of the word "incendiary device" under 49 U.S.C. § 46505, the absence of proof of knowing possession, and the statute's use of the phrase "on or about one's person" to describe the location of the device.  With respect to count two, these include whether the oral statements in fact were made, as reported by the customs inspector, <u>cf</u>. <u>United States v. Poutre</u>, 646 F.2d 685 (1st Cir. 1980) (finding that, where statement alleged to be false "is found only in a solitary prosecution witness' testimony without any contemporary corroboration, such oral evidence is too fragile to support a

guilty verdict"); whether they were willfully made, and whether they were material.

While we appreciate the Court's sensitivity to the importance of a quick trial date in this case, we submit that the Constitution's guarantee of a speedy trial does not vitiate its guarantee of reasonable bail.  We submit that the bail and conditions ordered by Magistrate-Judge Collings are more than sufficient, under the circumstances, to reasonably assure Mr. AlMohandis' appearance at trial.

ESSAM ALMOHANDIS
By his attorney,

Miriam Conrad
B.B.O. # 550223
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA   02110
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Miriam Conrad, hereby certify that a true copy of the above document was served upon Assistant United States Attorney Gregory Moffatt and U.S. Pretrial Services Officer September Brown by delivery on January 21, 2004.

Miriam Conrad

-12-

INCIDENT REPORT NUMBER:  20042801000200   APPROVAL STATUS: APPROVED
PORT CODE:*      2801        DATE:* 01032004            TIME:* 1300
LOCATION:       S F INTL ARPT
INCIDENT TYPE:* N (N=NEG SRCH, P=PSNGR PROTEST, R=PORT RNR, T=POTENT VIOLENT,
          V=VIOLENT, O=OTHER, S=NON-SAS POS SRCH, C=NON SAS CATTI VIOLATION)

LASTNAME:*  ALHAYAN
FIRSTNAME:* MOHAMMAD                MI:    DATE OF BIRTH:* 07271975
ADDRESS:
CITY:   RIYADH                    STATE:    ZIP:          COUNTRY: SA
RACE:* W HISPANIC:* N GENDER:* M HT:    WT:     HR:     EYES:    CITZ:* SA
 CONVEYANCE TYPE: C COMMERCIAL AI  IN/OUT:* I PORT RUNNER TYPE:   COUNTRY:
 - AIRLINE: LH  FLT#: 454   CREW: N DEPRT/DESTN AIRPRT: FRA FLT DEPRT CTRY: DE
 - LICENSE-YEAR:       STATE:    COUNTRY:    NUMBER:         PASSENGERS:
PRIMARY OFCR ID:*          HAYES/R-CUSTOMS INSPR-C
SUPERVISOR ID:*           LEWIN/R-SUPERVISORY CUSTOMS INSPECTOR-C


   (PF1=HELP) (PF2=FLD HELP) (PF3=MAIN MENU) (PF4=PREV MENU) (PF8=NEXT PAGE)
      (PF9=VIEW ACCESS)                  (PF16=PRINT) (PF10=IMAGE)

```
INCIDENT RPT#: 20042801000200 NAME: MOHAMMAD   ALHAYAN
 PAX EMBARKING ARPRT:  RUH KING KHALED INTL        DECLARATION: W (O=ORL,W=WRTN)
  REFERRING OFCR CDE:* RVR ROVER
   REASON FOR SEARCH:* 004 INTELLIGENCE (E.G. TEC ,      ,
SEARCH TYPE:* P           (I=IPTDN,B=BODY SCN,P=PTDN,S=BODY,R=XRY,C=CVTY,M=MEM)

 BODY SCAN OFFERED:* N (Y/N)  REASON CODE:  N NOT AT LOCATION
   PORT DIR NTFD: N (Y/N/D) DTE:            TME:    :     2 HR DETENTION:* N
    CHIEF CNSL NTFD:* N (Y/N)     8 HOUR DETENTION - AUSA NOTIFIED:* N (Y/N)
 SEARCH - TIME START:  13 : 28  TIME COMPLT:  13 : 29  FUNDS ON PAX:      400

    SEARCHING OFFICER:* 620090989     HAYES/R-CUSTOMS INSPR-C
    AUTHORIZE OFFICER:* 554983208     LEWIN/R-SUPERVISORY CUSTOMS INSPECTOR-C
             WITNESS:                 KERNER/D-CUSTOMS INSPR-C
    REASON FOR SEARCH:* PASSENGER IS ASSOC. WITH ESSAM ALMOHANIS, 8/3/70, WHO
                        WAS ARRESTED 1/3/03 AT LOGAN INTL FOR POSS. OF EXPLOSIV
                        E MATERIAL. MR. ALHAYAN WAS DEPORTED BY INS.


        (PF1=HELP) (PF2=FLD HELP) (PF3=MAIN MENU) (PF4=PREV MENU)
        (PF7=PREV PAGE) (PF8=NEXT PAGE)              (PF19=SEND TO SUPERVISOR)
```

REMARKS:
At approximately 12:45 hrs on 01/03/04,  SC1 Hector Almonte was notified
by the PAU at Boston's Logan International Airport that a passenger by
the name of Al Hayan, Mohammad was a co-traveler of a subject they
currently had detained for having what appeared to be some type of
explosives device in his carry on baggage.  CBP Inspector's at Logan
International had found that Almohandis, Essam Mohammed, who arrived on
LH 422 from Frankfurt, Germany, was in possession of three small
incendiary devices. When asked who he was traveling with, Almohandis
stated he had been with Al Hayan, Mohammad from Saudi Arabia to
Frankfurt, Germany where they went their separate ways. Upon getting
this information, CBP Supervisory Inspector Mike Cunningham notified
SFO.

   At approximately 1300 hrs. after arrival aboard LH 454, Al Hayan was
intercepted by CBP Inspector Ryan Santino and escorted to Passport
                                                                   MORE...

  (PF1=HELP) (PF2=FLD HELP) (PF3=MAIN MENU) (PF4=PREV MENU) (PF7=PREV PAGE)
  (PF8=NEXT PAGE)

REMARKS:
Control for secondary examination. Patdown was requested at 1327 hrs. by
CI Hayes and approved by SCI Lewin at 1327 hrs. Patdown began at 1328
hrs. and ended at 1329 hrs. with negative results. Patdown was conducted
by CI Hayes and witnessed by SI Kerner and CI Giffin. Baggage exam was
also negative. Duty ICE Agent Kondrick Yeung was notified by the PAU at
approximately 13:15 hrs. and advised of the situation. SA Yeung and RAIC
Robin Landis arrived at SFO at approximately 1400 hrs. NTC was also
notified and the PAU was given a T-Log # 28820.

After briefing SA Yeung on the situation, an interview of Al Hayan was
conducted by SA Yeung and CBP Inspector's Kerner, Hayes and Santino upon
Al Hayan being read his Miranda rights. During the interview, Al Hayan
was very cooperative. Al Hayan  stated he was employed as a bio-medical
engineer at King Faisal Specialist Hospital. He stated he had worked
there for five years, first as a bio-medical technician and then as an
                                                                    MORE...

   (PF1=HELP) (PF2=FLD HELP) (PF3=MAIN MENU) (PF4=PREV MENU) (PF7=PREV PAGE)
   (PF8=NEXT PAGE) (PF10=FIRST PAGE)

10:17:03:14        TECS FT - INCIDENT LOG        01/04/2004 02M30144
TID-N0MZ        REMARKS - CONTINUED        T2P08141
INCIDENT REPORT NUMBER:  20042801000200          A
NAME: MOHAMMAD  ALHAYAN                PAGE   3

Case 1:04-cr-10004-PBS   Document 19   Filed 01/21/2004   Page 17 of 38

REMARKS:
engineer. Al Hayan stated he was here in the U.S. for training on a
specific piece of medical equipment, so that he could maintain it at the
hospital he worked at. The training was to go from 01/05/04 to 01/14/04
and would be held at Perkin-Elmer, 75 Nicholson Lane, San Jose, CA.
(This address comes back to numerous I-94 records, but no other TECS
hits.) According to Al Hayan he would be staying at the Crown Plaza
Silicon Valley San Jose. Al Hayan said that he had known Almohandis for
five years and did not know him to have any hostile tendencies towards
the United States. Al Hayan was asked if he donated to or belonged to
any charities, to which he said, "no". He also said Almohandis, to his
knowledge did not belong to any charities. When shown the photos of the
explosive devices found on Almohandis, Al Hayan stated he had never seen
them before. Al Hayan was not told that these were found in the bags of
Almohandis.

MORE...

  (PF1=HELP) (PF2=FLD HELP) (PF3=MAIN MENU) (PF4=PREV MENU) (PF7=PREV PAGE)
  (PF8=NEXT PAGE) (PF10=FIRST PAGE)

REMARKS:
Upon completion of the interview, Al Hayan was turned over to CBP
Passport Control for further immigration processing. NTC notified
Passport Control that Al Hayan was to be refused entry into the U.S. for
association with Almohandis.

SCI Notes: Sit Room Report #13878 filed at 2035 hours 01-03-2004 Pacific Time

    (PF1=HELP) (PF2=FLD HELP) (PF3=MAIN MENU) (PF4=PREV MENU) (PF7=PREV PAGE)
    (PF8=NEXT PAGE) (PF10=FIRST PAGE)

## No. 14118

---

## MULTILATERAL

### Convention for the suppression of unlawful acts against the safety of civil aviation (with Final Act of the International Conference on Air Law held under the auspices of the International Civil Aviation Organization at Montreal in September 1971). Concluded at Montreal on 23 September 1971

*Authentic texts: English, French, Russian and Spanish.*

*Registered by the United States of America, the United Kingdom of Great Britain and Northern Ireland and the Union of Soviet Socialist Republics on 18 July 1975.*

---

## MULTILATÉRAL

### Convention pour la répression d'actes illicites dirigés contre la sécurité de l'aviation civile (avec Acte final de la Conférence internationale de droit aérien tenue sous les auspices de l'Organisation de l'aviation civile internationale à Montréal en septembre 1971). Conclue à Montréal le 23 septembre 1971

*Textes authentiques : anglais, français, russe et espagnol.*

*Enregistrée par les États-Unis d'Amérique, le Royaume-Uni de Grande-Bretagne et d'Irlande du Nord et l'Union des Républiques socialistes soviétiques le 18 juillet 1975.*

# CONVENTION[1] FOR THE SUPPRESSION OF UNLAWFUL ACTS AGAINST THE SAFETY OF CIVIL AVIATION

The States Parties to the Convention

Considering that unlawful acts against the safety of civil aviation jeopardize the safety of persons and property, seriously affect the operation of air services, and undermine the confidence of the peoples of the world in the safety of civil aviation;

Considering that the occurrence of such acts is a matter of grave concern;

Considering that, for the purpose of deterring such acts, there is an urgent need to provide appropriate measures for punishment of offenders;

Have agreed as follows:

*Article 1.* 1. Any person commits an offence if he unlawfully and intentionally:

(a) performs an act of violence against a person on board an aircraft in flight if that act is likely to endanger the safety of that aircraft; or

(b) destroys an aircraft in service or causes damage to such an aircraft which renders it incapable of flight or which is likely to endanger its safety in flight; or

---

[1] Came into force on 26 January 1973 in respect of the following States, on behalf of which an instrument of ratification or accession had been deposited with the Governments of the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland or the United States of America, i.e. 30 days following the date (27 December 1972) of deposit of the instruments of ratification of ten signatory States having participated in the Montreal Conference, in accordance with article 15(3):

| *State* | *Date of deposit of instrument of ratification or accession (a) at London (L), Moscow (M) or Washington (W)* | |
|---|---|---|
| Brazil* | 24 July | 1972 (L,M,W) |
| Canada | 19 June | 1972 (L) |
| | 20 June | 1972 (W) |
| | 23 July | 1972 (M) |
| Chad | 12 July | 1972 (L,W) |
| | 17 August | 1972 (M) |
| German Democratic Republic* | 9 July | 1972 (M) |
| Guyana | 21 December | 1972 a (W) |
| Hungary* | 27 December | 1972 (L,M,W) |
| Israel | 30 June | 1972 (L) |
| | 6 July | 1972 (W) |
| | 10 July | 1972 (M) |
| Malawi* | 21 December | 1972 a (W) |
| Mali | 24 August | 1972 a (W) |
| Mongolia* | 5 September | 1972 (W) |
| | 14 September | 1972 (L) |
| | 20 October | 1972 (M) |
| Niger | 1 September | 1972 (W) |
| Panama | 24 April | 1972 (W) |
| Republic of China* | 27 December | 1972 (W) |
| South Africa* | 30 May | 1972 (W) |
| Spain | 30 October | 1972 (W) |
| Trinidad and Tobago | 9 February | 1972 (W) |
| United States of America | 1 November | 1972 (W) |
| | 15 November | 1972 (L) |
| | 22 November | 1972 (M) |
| Yugoslavia | 2 October | 1972 (L,M,W) |

(Continued on p. 179)

(c) places or causes to be placed on an aircraft in service, by any means whatsoever, a device or substance which is likely to destroy that aircraft, or to cause damage to it which renders it incapable of flight, or to cause damage to it which is likely to endanger its safety in flight; or

(d) destroys or damages air navigation facilities or interferes with their operation, if any such act is likely to endanger the safety of aircraft in flight; or

(e) communicates information which he knows to be false, thereby endangering the safety of an aircraft in flight.

2.   Any person also commits an offence if he:

(a) attempts to commit any of the offences mentioned in paragraph 1 of this Article; or

(b) is an accomplice of a person who commits or attempts to commit any such offence.

*(Footnote 1 continued from p. 178)*

Subsequently, the Convention came into force for the States listed below 30 days after the date of deposit of their instrument of ratification or accession with the Governments of the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland or the United States of America, in accordance with article 15 (4):

| State | Date of deposit of instrument of ratification or accession (a) at London (L), Moscow (M) or Washington (W) | |
|---|---|---|
| Argentina.................................... (With effect from 25 December 1973) | 26 November | 1973 (L,M,W) |
| Australia...................................... (With effect from 11 August 1973) | 12 July | 1973 (L,M,W) |
| Austria....................................... (With effect from 13 March 1974) | 11 February | 1973 (L,M,W) |
| Bulgaria*..................................... (With effect from 24 March 1973) | 22 February | 1973 (L) |
| | 28 March | 1973 (W) |
| | 20 March | 1974 (M) |
| Byelorussian Soviet Socialist Republic*...................... (With effect from 2 March 1973) | 31 January | 1973 (M) |
| Chile.......................................... (With effect from 30 March 1974) | 28 February | 1974 a (W) |
| Costa Rica.................................... (With effect from 21 October 1973) | 21 September | 1973 (W) |
| Cyprus........................................ (With effect from 14 September 1973) | 27 July | 1973 (L) |
| | 30 July | 1973 (M) |
| | 15 August | 1973 (W) |
| Czechoslovakia*............................... (With effect from 9 September 1973) | 10 August | 1973 (L,M,W) |
| Denmark...................................... (With effect from 16 February 1973. Decision reserved as regards the application of the Convention to the Faroe Islands and Greenland) | 17 January | 1973 (L,M,W) |
| Dominican Republic........................... (With effect from 28 December 1973) | 28 November | 1973 (W) |
| Fiji........................................... (With effect from 4 April 1973) | 5 March | 1973 (W) |
| | 18 April | 1973 (L) |
| | 28 April | 1973 (M) |
| Finland....................................... (With effect from 12 August 1973) | 13 July | 1973 a (L,M,W) |
| Ghana........................................ (With effect from 11 January 1974) | 12 December | 1973 a (W) |
| Greece........................................ (With effect from 14 February 1974) | 15 January | 1974 (W) |
| Iceland....................................... (With effect from 29 July 1973) | 29 June | 1973 (M) |
| | 29 June | 1973 a (L,W) |
| Iran.......................................... (With effect from 9 August 1973) | 10 July | 1973 a (L,M,W) |
| Iraq*......................................... (With effect from 10 October 1974) | 10 September | 1974 a (M) |

(Continued on p. 180)

*Article 2.* For the purposes of this Convention:

(a) an aircraft is considered to be in flight at any time from the moment when all its external doors are closed following embarkation until the moment when any such door is opened for disembarkation; in the case of a forced landing, the flight shall be deemed to continue until the competent authorities take over the responsibility for the aircraft and for persons and property on board;

*(Footnote 1 continued from p. 179)*

| State | Date of deposit of instrument of ratification or accession (a) at London (L), Moscow (M) or Washington (W) | |
|---|---|---|
| Italy ............................................................ | 19 February | 1974 (L,M,W) |
| (With effect from 21 March 1974) | | |
| Ivory Coast ..................................................... | 9 January | 1973 a (W) |
| (With effect from 8 February 1973) | | |
| Japan ............................................................ | 12 June | 1974 a (L,W) |
| (With effect from 12 July 1974) | | |
| Jordan ........................................................... | 13 February | 1973 (L) |
|  | 19 February | 1973 (M) |
| (With effect from 15 March 1973) | 25 April | 1973 (W) |
| Libyan Arab Republic ........................................... | 19 February | 1974 a (W) |
| (With effect from 21 March 1974) | | |
| Mexico ........................................................... | 12 September | 1974 (L,M,W) |
| (With effect from 12 October 1974) | | |
| Netherlands...................................................... | 27 August | 1973 (L,M,W) |
| (With effect from 26 September 1973 for the Kingdom in Europe and Surinam, and with a declaration to the effect that the Convention shall apply to the Netherlands Antilles from 11 June 1974) | | |
| New Zealand ..................................................... | 12 February | 1974 (L,M,W) |
| (With effect from 14 March 1974) | | |
| Nicaragua ........................................................ | 6 November | 1973 (W) |
| (With effect from 6 December 1973) | | |
| Nigeria ........................................................... | 3 July | 1973 a (W) |
|  | 9 July | 1973 a (L) |
| (With effect from 2 August 1973) | 20 July | 1973 a (M) |
| Norway ........................................................... | 1 August | 1973 a (L,M,W) |
| (With effect from 31 August 1973) | | |
| Pakistan.......................................................... | 16 January | 1974 a (M) |
| (With effect from 15 February 1974) | 24 January | 1974 a (L,W) |
| Paraguay ......................................................... | 5 March | 1974 (W) |
| (With effect from 4 April 1974) | | |
| Philippines ....................................................... | 26 March | 1973 (W) |
| (With effect from 25 April 1973) | | |
| Poland* .......................................................... | 26 January | 1975 (L,M) |
| (With effect from 27 February 1975) | | |
| Portugal.......................................................... | 15 January | 1973 (L) |
| (With effect from 14 February 1973) | | |
| Republic of Korea*............................................... | 2 August | 1973 a (W) |
| (With effect from 1 September 1973) | | |
| Saudi Arabia* .................................................... | 14 June | 1974 a (W) |
| (With effect from 14 July 1974) | | |
| Sweden........................................................... | 10 July | 1973 a (L,M,W) |
| (With effect from 9 August 1973) | | |
| Ukrainian Soviet Socialist Republic* ........................... | 26 February | 1973 (M) |
| Union of Soviet Socialist Republics* ........................... | 19 February | 1973 (L,M,W) |
| (With effect from 21 March 1973) | | |
| United Kingdom of Great Britain and Northern Ireland* ........ | 25 October | 1973 (L,M,W) |
| (With effect from 24 November 1973. In respect of the United Kingdom of Great Britain and Northern Ireland and Territories under the territorial sovereignty of the United Kingdom as well as the British Solomon Islands Protectorate) | | |
| United Republic of Cameroon* .................................. | 11 July | 1973 a (W) |
| (With effect from 10 August 1973) | | |

* See p. 223 of this volume for the text of the reservations and declarations made upon ratification or accession.

Case 1:04-cr-10004-PBS    Document 19    Filed 01/21/2004    Page 23 of 38

(*b*)  an aircraft is considered to be in service from the beginning of the preflight preparation of the aircraft by ground personnel or by the crew for a specific flight until twenty-four hours after any landing; the period of service shall, in any event, extend for the entire period during which the aircraft is in flight as defined in paragraph (*a*) of this Article.

*Article 3.*  Each Contracting State undertakes to make the offences mentioned in Article 1 punishable by severe penalties.

*Article 4.*  1.  This Convention shall not apply to aircraft used in military, customs or police services.

2.  In the cases contemplated in subparagraphs (*a*), (*b*), (*c*) and (*e*) of paragraph 1 of Article 1, this Convention shall apply, irrespective of whether the aircraft is engaged in an international or domestic flight, only if:

(*a*)  the place of take-off or landing, actual or intended, of the aircraft is situated outside the territory of the State of registration of that aircraft; or

(*b*)  the offence is committed in the territory of a State other than the State of registration of the aircraft.

3.  Notwithstanding paragraph 2 of this Article, in the cases contemplated in subparagraphs (*a*), (*b*), (*c*) and (*e*) of paragraph 1 of Article 1, this Convention shall also apply if the offender or the alleged offender is found in the territory of a State other than the State of registration of the aircraft.

4.  With respect to the States mentioned in Article 9 and in the cases mentioned in subparagraphs (*a*), (*b*), (*c*) and (*e*) of paragraph 1 of Article 1, this Convention shall not apply if the places referred to in subparagraph (*a*) of paragraph 2 of this Article are situated within the territory of the same State where that State is one of those referred to in Article 9, unless the offence is committed or the offender or alleged offender is found in the territory of a State other than that State.

5.  In the cases contemplated in subparagraph (*d*) of paragraph 1 of Article 1, this Convention shall apply only if the air navigation facilities are used in international air navigation.

6.  The provisions of paragraphs 2, 3, 4 and 5 of this Article shall also apply in the cases contemplated in paragraph 2 of Article 1.

*Article 5.*  1.  Each Contracting State shall take such measures as may be necessary to establish its jurisdiction over the offences in the following cases:

(*a*)  when the offence is committed in the territory of that State;

(*b*)  when the offence is committed against or on board an aircraft registered in that State;

(*c*)  when the aircraft on board which the offence is committed lands in its territory with the alleged offender still on board;

(*d*)  when the offence is committed against or on board an aircraft leased without crew to a lessee who has his principal place of business or, if the lessee has no such place of business, his permanent residence, in that State.

2.  Each Contracting State shall likewise take such measures as may be necessary to establish its jurisdiction over the offences mentioned in Article 1, paragraph 1 (*a*), (*b*) and (*c*), and in Article 1, paragraph 2, in so far as that paragraph relates to those offences, in the case where the alleged offender is present in its territory and it does not extradite him pursuant to Article 8 to any of the States mentioned in paragraph 1 of this Article.

Case 1:04-cr-10004-PBS    Document 19    Filed 01/21/2004    Page 24 of 38

3.   This Convention does not exclude any criminal jurisdiction exercised in accordance with national law.

*Article 6.*  1.   Upon being satisfied that the circumstances so warrant, any Contracting State in the territory of which the offender or the alleged offender is present, shall take him into custody or take other measures to ensure his presence. The custody and other measures shall be as provided in the law of that State but may only be continued for such time as is necessary to enable any criminal or extradition proceedings to be instituted.

2.   Such State shall immediately make a preliminary enquiry into the facts.

3.   Any person in custody pursuant to paragraph 1 of this Article shall be assisted in communicating immediately with the nearest appropriate representative of the State of which he is a national.

4.   When a State, pursuant to this Article, has taken a person into custody, it shall immediately notify the States mentioned in Article 5, paragraph 1, the State of nationality of the detained person and, if it considers it advisable, any other interested State of the fact that such person is in custody and of the circumstances which warrant his detention. The State which makes the preliminary enquiry contemplated in paragraph 2 of this Article shall promptly report its findings to the said States and shall indicate whether it intends to exercise jurisdiction.

*Article 7.*   The Contracting State in the territory of which the alleged offender is found shall, if it does not extradite him, be obliged, without exception whatsoever and whether or not the offence was committed in its territory, to submit the case to its competent authorities for the purpose of prosecution. Those authorities shall take their decision in the same manner as in the case of any ordinary offence of a serious nature under the law of that State.

*Article 8.*  1.   The offences shall be deemed to be included as extraditable offences in any extradition treaty existing between Contracting States. Contracting States undertake to include the offences as extraditable offences in every extradition treaty to be concluded between them.

2.   If a Contracting State which makes extradition conditional on the existence of a treaty receives a request for extradition from another Contracting State with which it has no extradition treaty, it may at its option consider this Convention as the legal basis for extradition in respect of the offences. Extradition shall be subject to the other conditions provided by the law of the requested State.

3.   Contracting States which do not make extradition conditional on the existence of a treaty shall recognize the offences as extraditable offences between themselves subject to the conditions provided by the law of the requested State.

4.   Each of the offences shall be treated, for the purpose of extradition between Contracting States, as if it had been committed not only in the place in which it occurred but also in the territories of the States required to establish their jurisdiction in accordance with Article 5, paragraph 1 (*b*), (*c*) and (*d*).

*Article 9.*   The Contracting States which establish joint air transport operating organizations or international operating agencies, which operate aircraft which are subject to joint or international registration shall, by appropriate means, designate for each aircraft the State among them which shall exercise the jurisdiction and have the attributes of the State of registration for the purpose of this Convention and shall give notice thereof to the International Civil Aviation Organization which shall communicate the notice to all States Parties to this Convention.

*Article 10.*   1.   Contracting States shall, in accordance with international and national law, endeavour to take all practicable measure for the purpose of preventing the offences mentioned in Article 1.

2.   When, due to the commission of one of the offences mentioned in Article 1, a flight has been delayed or interrupted, any Contracting State in whose territory the aircraft or passengers or crew are present shall facilitate the continuation of the journey of the passengers and crew as soon as practicable, and shall without delay return the aircraft and its cargo to the persons lawfully entitled to possession.

*Article 11.* (1)  Contracting States shall afford one another the greatest measure of assistance in connection with criminal proceedings brought in respect of the offences. The law of the State requested shall apply in all cases.

2.   The provisions of paragraph 1 of this Article shall not affect obligations under any other treaty, bilateral or multilateral, which governs or will govern, in whole or in part, mutual assistance in criminal matters.

*Article 12.*   Any Contracting State having reason to believe that one of the offences mentioned in Article 1 will be committed shall, in accordance with its national law, furnish any relevant information in its possession to those States which it believes would be the States mentioned in Article 5, paragraph 1.

*Article 13.*   Each Contracting State shall in accordance with its national law report to the Council of the International Civil Aviation Organization as promptly as possible any relevant information in its possession concerning:

(*a*) the circumstances of the offence;

(*b*) the action taken pursuant to Article 10, paragraph 2;

(*c*) the measures taken in relation to the offender or the alleged offender and, in particular, the results of any extradition proceedings or other legal proceedings.

*Article 14.*   1.   Any dispute between two or more Contracting States concerning the interpretation or application of this Convention which cannot be settled through negotiation, shall, at the request of one of them, be submitted to arbitration. If within six months from the date of the request for arbitration the Parties are unable to agree on the organization of the arbitration, any one of those Parties may refer the dispute to the International Court of Justice by request in conformity with the Statute of the Court.

2.   Each State may at the time of signature or ratification of this Convention or accession thereto, declare that it does not consider itself bound by the preceding paragraph. The other Contracting States shall not be bound by the preceding paragraph with respect to any Contracting State having made such a reservation.

3.   Any Contracting State having made a reservation in accordance with the preceding paragraph may at any time withdraw this reservation by notification to the Depositary Governments.

*Article 15.*   1.   This Convention shall be open for signature at Montreal on 23 September 1971, by States participating in the International Conference on Air Law held at Montreal from 8 to 23 September 1971 (hereinafter referred to as the Montreal Conference). After 10 October 1971, the Convention shall be open to all States for signature in Moscow, London and Washington. Any State which does not sign this Convention before its entry into force in accordance with paragraph 3 of this Article may accede to it at any time.

2.    This Convention shall be subject to ratification by the signatory States. Instruments of ratification and instruments of accession shall be deposited with the Governments of the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland, and the United States of America, which are hereby designated the Depositary Governments.

3.    This Convention shall enter into force thirty days following the date of the deposit of instruments of ratification by ten States signatory to this Convention which participated in the Montreal Conference.

4.    For other States, this Convention shall enter into force on the date of entry into force of this Convention in accordance with paragraph 3 of this Article, or thirty days following the date of deposit of their instruments of ratification or accession, whichever is later.

5.    The Depositary Governments shall promptly inform all signatory and acceding States of the date of each signature, the date of deposit of each instrument of ratification or accession, the date of entry into force of this Convention, and other notices.

6.    As soon as this Convention comes into force, it shall be registered by the Depositary Governments pursuant to Article 102 of the Convention on International Civil Aviation (Chicago, 1944).[1]

*Article 16.*    1.    Any Contracting State may denounce this Convention by written notification to the Depositary Governments.

2.    Denunciation shall take effect six months following the date on which notification is received by the Depositary Governments.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, being duly authorized thereto by their Governments, have signed this Convention.

DONE at Montreal, this twenty-third day of September, one thousand nine hundred and seventy-one, in three originals, each being drawn up in four authentic texts in the English, French, Russian and Spanish languages.

---

[1] United Nations, *Treaty Series*, vol. 15, p. 295. For the texts of the Protocols amending this Convention, see vol. 320, pp. 209 and 217; vol. 418, p. 161; vol. 514, p. 209; vol. 740, p. 21, and vol. 893, p. 117.

## CONVENTION FOR THE SUPPRESSION OF UNLAWFUL ACTS

## AGAINST THE SAFETY OF CIVIL AVIATION

### SIGNED AT MONTREAL ON 23 SEPTEMBER 1971

**Entry into force:**    The Convention entered into force on 26 January 1973.
**Status:**    179 Parties.

This list is based on information received from the depositaries, the Governments of the Russian Federation, the United Kingdom and the United States.

| State | Date of signature | Date of deposit of instrument of ratification, accession or succession |
| --- | --- | --- |
| Afghanistan(1) | | 26 September 1984 |
| Albania | | 21 October 1997 |
| Algeria(2) | | 6 October 1995 |
| Angola | | 12 March 1998 |
| Antigua and Barbuda | | 22 July 1985 |
| Argentina | 23 September 1971 | 26 November 1973 |
| Armenia | | 10 September 2002 |
| Australia | 12 October 1972 | 12 July 1973 |
| Austria | 13 November 1972 | 11 February 1974 |
| Azerbaijan | | 15 March 2000 |
| Bahamas | | 27 December 1984 |
| Bahrain(1) | | 20 February 1984 |
| Bangladesh | | 28 June 1978 |
| Barbados | 23 September 1971 | 6 August 1976 |
| Belarus(1) | 23 September 1971 | 31 January 1973 |
| Belgium | 23 September 1971 | 13 August 1976 |
| Belize | | 10 June 1998 |
| Bhutan | | 28 December 1988 |
| Bolivia | | 18 July 1979 |
| Bosnia and Herzegovina(3) | | 15 August 1994 |
| Botswana | 12 October 1972 | 28 December 1978 |
| Brazil(1) | 23 September 1971 | 24 July 1972 |
| Brunei Darussalam | | 16 April 1986 |
| Bulgaria(4) | 23 September 1971 | 28 March 1973 |
| Burkina Faso | | 19 October 1987 |
| Burundi | 6 March 1972 | 11 February 1999 |
| Cambodia | | 8 November 1996 |
| Cameroon(5) | | 11 July 1973 |
| Canada | 23 September 1971 | 19 June 1972 |
| Cape Verde | | 20 October 1977 |
| Central African Republic | | 1 July 1991 |
| Chad | 23 September 1971 | 12 July 1972 |
| Chile | | 28 February 1974 |

| | | |
|---|---|---|
| China(1)(6)(30) | | 10 September 1980 |
| Colombia | | 4 December 1974 |
| Comoros | | 1 August 1991 |
| Congo | 23 September 1971 | 19 March 1987 |
| Costa Rica | 23 September 1971 | 21 September 1973 |
| Côte d'Ivoire | | 9 January 1973 |
| Croatia(7) | | 8 June 1993 |
| Cuba(1) | | 31 October 2001 |
| Cyprus | 28 November 1972 | 27 July 1973 |
| Czech Republic(8) | | 14 November 1994 |
| Democratic People's Republic of Korea | | 13 August 1980 |
| Democratic Republic of the Congo | | 6 July 1977 |
| Denmark(9) | 17 October 1972 | 17 January 1973 |
| Djibouti | | 24 November 1992 |
| Dominican Republic | 31 May 1972 | 28 November 1973 |
| Ecuador | | 12 January 1977 |
| Egypt(1) | 24 November 1972 | 20 May 1975 |
| El Salvador | | 25 September 1979 |
| Equatorial Guinea | | 2 January 1991 |
| Estonia | | 22 December 1993 |
| Ethiopia(1) | 23 September 1971 | 26 March 1979 |
| Fiji | 21 August 1972 | 5 March 1973 |
| Finland | | 13 July 1973 |
| France(1) | | 30 June 1976 |
| Gabon | 24 November 1971 | 29 June 1976 |
| Gambia | | 28 November 1978 |
| Georgia | | 20 April 1994 |
| Germany(10) | 23 September 1971 | 3 February 1978 |
| Ghana | | 12 December 1973 |
| Greece | 9 February 1972 | 15 January 1974 |
| Grenada | | 10 August 1978 |
| Guatemala(1) | 9 May 1972 | 19 October 1978 |
| Guinea | | 2 May 1984 |
| Guinea-Bissau | | 20 August 1976 |
| Guyana | | 21 December 1972 |
| Haiti | 6 January 1972 | 9 May 1984 |
| Honduras | | 13 April 1987 |
| Hungary(11) | 23 September 1971 | 27 December 1972 |
| Iceland | | 29 June 1973 |
| India | 11 December 1972 | 12 November 1982 |
| Indonesia(1) | | 27 August 1976 |
| Iran (Islamic Republic of) | | 10 July 1973 |
| Iraq | | 10 September 1974 |
| Ireland | | 12 October 1976 |
| Israel | 23 September 1971 | 30 June 1972 |

| | | |
|---|---|---|
| Italy | 23 September 1971 | 19 February 1974 |
| Jamaica | 23 September 1971 | 15 September 1983 |
| Japan | | 12 June 1974 |
| Jordan | 2 May 1972 | 13 February 1973 |
| Kazakhstan | | 4 April 1995 |
| Kenya | | 11 January 1977 |
| Kuwait(12) | | 23 November 1979 |
| Kyrgyzstan | | 25 February 2000 |
| Lao People's Democratic Republic | 1 November 1972 | 6 April 1989 |
| Latvia | | 13 April 1997 |
| Lebanon | | 23 December 1977 |
| Lesotho | | 27 July 1978 |
| Liberia | | 1 February 1982 |
| Libyan Arab Jamahiriya | | 19 February 1974 |
| Liechtenstein | | 23 February 2001 |
| Lithuania | | 4 December 1996 |
| Luxembourg | 29 November 1971 | 18 May 1982 |
| Madagascar | | 18 November 1986 |
| Malawi(1) | | 21 December 1972 |
| Malaysia | | 4 May 1985 |
| Maldives | | 1 September 1987 |
| Mali | | 24 August 1972 |
| Malta | | 14 June 1991 |
| Marshall Islands | | 31 May 1989 |
| Mauritania | | 1 November 1978 |
| Mauritius | | 25 April 1983 |
| Mexico | 25 January 1973 | 12 September 1974 |
| Micronesia (Federated States of) | | 19 March 2003 |
| Monaco | | 3 June 1983 |
| Mongolia(1) | 18 February 1972 | 14 September 1972 |
| Morocco(13) | | 24 October 1975 |
| Mozambique(1) | | 16 January 2003 |
| Myanmar | | 22 May 1996 |
| Nauru | | 17 May 1984 |
| Nepal | | 11 January 1979 |
| Netherlands(14) | 23 September 1971 | 27 August 1973 |
| New Zealand | 26 September 1972 | 12 February 1974 |
| Nicaragua | 22 December 1972 | 6 November 1973 |
| Niger | 6 March 1972 | 1 September 1972 |
| Nigeria | | 3 July 1973 |
| Norway | | 1 August 1973 |
| Oman(1)(15) | | 2 February 1977 |
| Pakistan | | 24 January 1974 |
| Palau | | 3 August 1995 |
| Panama | 18 January 1972 | 24 April 1972 |
| Papua New Guinea(1) | | 15 December 1975 |

| | | |
|---|---|---|
| Paraguay | 23 January 1973 | 5 March 1974 |
| Peru(1) | | 28 April 1978 |
| Philippines | 23 September 1971 | 26 March 1973 |
| Poland(1)(29) | 23 September 1971 | 28 January 1975 |
| Portugal(26)(27) | 23 September 1971 | 15 January 1973 |
| Qatar(1) | | 26 August 1981 |
| Republic of Korea(16) | | 2 August 1973 |
| Republic of Moldova | | 21 May 1997 |
| Romania(1) | 10 July 1972 | 15 August 1975 |
| Russian Federation(1) | 23 September 1971 | 19 February 1973 |
| Rwanda | 26 June 1972 | 3 November 1987 |
| Saint Lucia | | 8 November 1983 |
| Saint Vincent and the Grenadines | | 29 November 1991 |
| Samoa | | 9 July 1998 |
| Saudi Arabia(1)(17) | | 14 June 1974 |
| Senegal | 23 September 1971 | 3 February 1978 |
| Serbia and Montenegro(28) | | 23 July 2001 |
| Seychelles | | 29 December 1978 |
| Sierra Leone | | 20 September 1979 |
| Singapore | 21 November 1972 | 12 April 1978 |
| Slovakia(18) | | 6 March 1995 |
| Slovenia(19) | | 27 May 1992 |
| Solomon Islands(20) | | 13 April 1982 |
| South Africa(1) | 23 September 1971 | 30 May 1972 |
| Spain | 15 February 1972 | 30 October 1972 |
| Sri Lanka | | 30 May 1978 |
| Sudan | | 18 January 1979 |
| Suriname(21) | | 27 October 1978 |
| Swaziland | | 27 December 1999 |
| Sweden | | 10 July 1973 |
| Switzerland | 23 September 1971 | 17 January 1978 |
| Syrian Arab Republic(1) | | 10 July 1980 |
| Tajikistan | | 29 February 1996 |
| Thailand | | 16 May 1978 |
| The former Yugoslav Republic of Macedonia(22) | | 4 January 1995 |
| Togo | | 9 February 1979 |
| Tonga | | 21 February 1977 |
| Trinidad and Tobago | 9 February 1972 | 9 February 1972 |
| Tunisia(1) | | 16 November 1981 |
| Turkey | 5 July 1972 | 23 December 1975 |
| Turkmenistan | | 25 May 1999 |
| Uganda | | 19 July 1982 |
| Ukraine(1) | 23 September 1971 | 26 January 1973 |
| United Arab Emirates(23) | | 10 April 1981 |

| | | |
|---|---|---|
| United Kingdom(24) | 23 September 1971 | 25 October 1973 |
| United Republic of Tanzania | | 9 August 1983 |
| United States | 23 September 1971 | 1 November 1972 |
| Uruguay | | 12 January 1977 |
| Uzbekistan | | 7 February 1994 |
| Vanuatu | | 6 November 1989 |
| Venezuela(25) | 23 September 1971 | 21 November 1983 |
| Viet Nam | | 17 September 1979 |
| Yemen | 23 October 1972 | 29 September 1986 |
| Zambia | | 3 March 1987 |
| Zimbabwe | | 6 February 1989 |

## NOTES

(1) Reservation made with respect to paragraph 1 of Article 14 of the Convention.

(2) Reservation: "The People's Democratic Republic of Algeria does not consider itself bound by the provisions of articles 24.1, 12.1 and 14.1 respectively of the Tokyo, The Hague and Montreal Conventions, which provide for the mandatory referral of any dispute to the International Court of Justice. The People's Democratic Republic of Algeria states that in each case the prior consent of all the parties concerned shall be required in order to refer a dispute to the International Court of Justice."

(3) Notification of succession by the Government of Bosnia and Herzegovina to the Convention was deposited with the Government of the United States on 15 August 1994, with effect from 6 March 1992.

(4) On 9 May 1994, a Note was deposited with the Government of the United States by the Government of Bulgaria whereby that Government withdraws the reservation made at the time of ratification with regard to paragraph 1 of Article 14 of the Convention. The withdrawal of the reservation took effect on 9 May 1994.

(5) "In accordance with the provisions of the Convention of 23 September 1971, for the Suppression of Unlawful Acts directed against the Security of Civil Aviation, the Government of the United Republic of Cameroon declares that in view of the fact that it does not have any relations with South Africa and Portugal, it has no obligation toward these two countries with regard to the implementation of the stipulations of the Convention."

(6) The instrument of accession by the Government of the People's Republic of China contains the following declaration: "The Chinese Government declares illegal and null and void the signature and ratification of the above-mentioned Convention by the Taiwan authorities in the name of China".

(7) An instrument of succession by the Government of Croatia to the Convention was deposited with the Government of the United States on 8 June 1993, with effect from 8 October 1991.

(8) An instrument of succession by the Government of the Czech Republic to the Convention was deposited with the Government of the Russian Federation on 14 November 1994, with effect from 1 January 1993.

(9) Until later decision, the Convention will not be applied to the Faroe Islands or to Greenland.

Note 1: A notification was received by the Government of the United Kingdom from the Government of the Kingdom of Denmark whereby the latter withdraws, with effect from 1 June 1980, the reservation made at the time of ratification that this Convention should not apply to Greenland.

Note 2: The Government of the United Kingdom subsequently received, on 21 September 1994, a notification from the Government of the Kingdom of Denmark whereby the latter withdraws, with effect from 1 October 1994, the reservation made at the time of ratification that this Convention should not apply to the Faroe Islands.

(10) The German Democratic Republic, which ratified the Convention on 9 June 1972, acceded to the Federal Republic

of Germany on 3 October 1990.

(11) On 10 January 1990, instruments were deposited with the Government of the United Kingdom and the Government of the United States by the Government of Hungary whereby that Government withdraws the reservation made at the time of ratification with regard to paragraph 1 of Article 14 of the Convention. The withdrawal of the reservation took effect on 10 January 1990.

(12) It is understood that accession to the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal, 1971, does not mean in any way recognition of Israel by the State of Kuwait. Furthermore, no treaty relation will arise between the State of Kuwait and Israel.

(13) "In case of a dispute, all recourse must be made to the International Court of Justice on the basis of the unanimous consent of the parties concerned".

(14) The Convention cannot enter into force for the Netherlands Antilles until thirty days after the date on which the Government of the Kingdom of the Netherlands shall have notified the depositary Governments that the necessary measures to give effect to the provisions of the Convention have been taken in the Netherlands Antilles.

Note 1: On 11 June 1974, a declaration was deposited with the Government of the United States by the Government of the Kingdom of the Netherlands stating that in the interim the measures required to implement the provisions of the Convention have been taken in the Netherlands Antilles and, consequently, the Convention will enter into force for the Netherlands Antilles on the thirtieth day after the date of deposit of this declaration.

Note 2: By a Note dated 9 January 1986 the Government of the Kingdom of the Netherlands informed the Government of the United States that as of 1 January 1986 the Convention is applicable to the Netherlands Antilles (without Aruba) and to Aruba.

(15) Accession to the said Convention by the Government of the Sultanate of Oman does not mean or imply, and shall not be interpreted as recognition of Israel generally or in the context of this Convention.

(16) The accession by the Government of the Republic of Korea to the present Convention does not in any way mean or imply the recognition of any territory or regime which has not been recognized by the Government of the Republic of Korea as a State or Government.

(17) Approval by Saudi Arabia does not mean and could not be interpreted as recognition of Israel generally or in the context of this Convention.

(18) An instrument of succession by the Government of Slovakia to the Convention was deposited with the Government of the United States on 6 March 1995, with effect from 1 January 1993.

(19) An instrument of succession by the Government of Slovenia to the Convention was deposited with the Government of the United Kingdom on 27 May 1992.

(20) An instrument of succession by the Government of Solomon Islands to the Convention was deposited with the Government of the United Kingdom on 13 April 1982. Solomon Islands attained independence on 7 July 1978.

(21) Notification of succession to the Convention was deposited with the Government of the United States on 27 October 1978, by virtue of the extension of the Convention to Suriname by the Kingdom of the Netherlands prior to independence. The Republic of Suriname attained independence on 25 November 1975.

(22) An instrument of succession by the Government of the former Yugoslav Republic of Macedonia to the Convention was deposited with the Government of the United States on 4 January 1995.

(23) "In accepting the said Convention, the Government of the United Arab Emirates takes the view that its acceptance of the said Convention does not in any way imply its recognition of Israel, nor does it oblige to apply the provisions of the Convention in respect of the said Country."

(24) The Convention is ratified "in respect of the United Kingdom of Great Britain and Northern Ireland and Territories under territorial sovereignty of the United Kingdom as well as the British Solomon Islands Protectorate".

Note: By a Note dated 20 November 1990, the Government of the United Kingdom declared that Anguilla has been

included under the ratification of the Convention by that Government with effect from 7 November 1990.

(25) The instrument of ratification by the Government of Venezuela contains the following reservation regarding Articles 4, 7 and 8 of the Convention:

"Venezuela will take into consideration clearly political motives and the circumstances under which offences described in Article 1 of this Convention are committed, in refusing to extradite or prosecute an offender, unless financial extortion or injury to the crew, passengers, or other persons has occurred".

The Government of the United Kingdom of Great Britain and Northern Ireland made the following declaration in a Note dated 6 August 1985 to the Department of State of the Government of the United States:

"The Government of the United Kingdom of Great Britain and Northern Ireland do not regard as valid the reservation made by the Government of the Republic of Venezuela insofar as it purports to limit the obligation under Article 7 of the Convention to submit the case against an offender to the competent authorities of the State for the purpose of prosecution".

With reference to the above declaration by the Government of the United Kingdom of Great Britain and Northern Ireland, the Government of Venezuela, in a Note dated 21 November 1985, informed the Department of State of the Government of the United States of the following:

"The reserve made by the Government of Venezuela to Articles 4, 7 and 8 of the Convention is based on the fact that the principle of asylum is contemplated in Article 116 of the Constitution of the Republic of Venezuela. Article 116 reads: 'The Republic grants asylum to any person subject to persecution or which finds itself in danger, for political reasons, within the conditions and requirements established by the laws and norms of international law.'

It is for this reason that the Government of Venezuela considers that in order to protect this right, which would be diminished by the application without limits of the said articles, it was necessary to request the formulation of the declaration contemplated in Art. 2 of the Law approving the Convention for the Suppression of Unlawful Acts Against the Security (sic) of Civil Aviation".

The Government of Italy made the following declaration in a Note dated 21 November 1985 to the Department of State of the Government of the United States:

"The Government of Italy does not consider as valid the reservation formulated by the Government of the Republic of Venezuela due to the fact that it may be considered as aiming to limit the obligation under Article 7 of the Convention to submit the case against an offender to the competent authorities of the State for the purpose of prosecution".

(26) By a Note dated 9 August 1999, the Government of the United Kingdom notified the International Civil Aviation Organization of the wish of the Government of Portugal to extend the Convention to the Territory of Macao, the extension taking effect on 19 July 1999.

(27) By a Note dated 27 October 1999, the Government of Portugal advised the Government of the United Kingdom as follows:

"In accordance with the Joint Declaration of the Government of the Portuguese Republic and the Government of the People's Republic of China on the Question of Macao signed on 13 April 1987, the Portuguese Republic will continue to have international responsibility for Macao until 19 December 1999 and from that date onwards the People's Republic of China will resume the exercise of sovereignty over Macao with effect from 20 December 1999.

From 20 December 1999 onwards the Portuguese Republic will cease to be responsible for the international rights and obligations arising from the application of the Convention to Macao."

(28) On 4 February 2003, the name of the State of the Federal Republic of Yugoslavia was changed to Serbia and Montenegro.

By a Note dated 17 July 2001, deposited on 23 July 2001 with the Government of the United Kingdom, the Government of the Federal Republic of Yugoslavia declared itself bound, as a successor State to the Socialist Federal Republic of Yugoslavia, by the provisions of, *inter alia*, this Convention, with effect from 27 April 1992, the date of State succession. (The former Socialist Federal Republic of Yugoslavia had signed the Convention on 23 September 1971 and ratified it on 2 October 1972.)

(29) On 23 June 1997, Poland deposited with the Government of the United States a notification of withdrawal of the reservation made in accordance with Article 14, paragraph 1 (see note 1).

(30) By a Note dated 29 November 1999, the Government of the People's Republic of China informed the Government of the United States as follows:

"The Convention...to which the Government of the People's Republic of China deposited an instrument of accession on 10 September 1980, will apply to the Macao Special Administrative Region with effect from 20 December 1999. The Government of the People's Republic of China also wishes to make the following declaration:

The reservation made by the Government of the People's Republic of China to paragraph 1 of Article 14 of the Convention will also apply to the Macao Special Administrative Region.

The Government of the People's Republic of China shall assume responsibility for the international rights and obligations arising from the application of the Convention to the Macao Special Administrative Region."



**U.S. Department of Justice**

Federal Bureau of Investigation



in the United States

**1997**

COUNTERTERRORISM THREAT ASSESSMENT and WARNING UNIT
NATIONAL SECURITY DIVISION

WMD
HOAXES
pg. 18



# TERR⊕RISM
## in the United States



Counterterrorism Threat Assessment and Warning Unit
National Security Division

# THE LONG ARM OF THE LAW

In its application of the long arm of the law, the United States has successfully returned a number of terrorists from other countries to stand trial for acts and planned acts of terrorism against U.S. citizens. There have been over 250 extraterritorial jurisdiction cases since laws were enacted in 1984 and 1986, expanding the FBI's extraterritorial jurisdiction. Since the mid-1980s, several high-profile international terrorists have been returned to the United States from foreign countries through use of a process known as irregular rendition.

For example, Omar Muhammed Ali Rezaq was arrested abroad in 1993 and brought to the United States to face trial for his role in the 1985 hijacking of EgyptAir Flight 648. World Trade Center bomber Ramzi Yousef was arrested by the FBI in Islamabad, Pakistan, in 1995 and returned to the United States to stand trial. Japanese Red Army member Tsutomu Shirosaki was taken into custody abroad and turned over to the FBI in 1996 to face trial for his role in a 1986 rocket attack on the U.S. Embassy compound in Jakarta, Indonesia.

In 1997, Mir Aimal Kansi was returned from overseas to stand trial in a Virginia court for the 1993 murders of two Central Intelligence Agency employees.

What is an irregular rendition and how does it differ from the more familiar process known as extradition? Extradition is a formal process through which a person is surrendered by one sovereign state to another by virtue of a treaty. The extradition process is usually initiated by a request transmitted through diplomatic channels. In the classic extradition model, an individual has been accused or convicted of an offense in one country, but is currently within the jurisdiction of another. Thus the government of the first country will make a request, following the guidelines established in a bilateral agreement with the government of the second, for the individual's return.

The general term rendition encompasses the formal process of extradition through a treaty. Irregular renditions, however, occur outside the parameters of extradition treaties. Frequently, the practice is borne of frustration at either the pace of the extradition process or the unwillingness of a country with whom the United States has a valid extradition treaty to render an individual to the United States to face trial. On some occasions, however, both governments will agree to bypass the formal extradition process to expedite an individual's removal to the United States to stand trial.

Irregular rendition devices fall into three categories: the abduction of an individual from one nation by agents of another nation, the informal surrender of an individual by one nation to another without formal or legal process, or the use of immigration laws to expel an accused or convicted criminal from a country.

Irregular rendition has deep historical roots. In the United States, the history of irregular rendition dates back further than that of extradition. Not surprisingly, many irregular renditions from early U.S. history involved the border countries of Canada and Mexico. However, not all did. A notable example involved the case of John Surratt. Surratt was accused of being a co-conspirator in the assassination of President Abraham Lincoln. In 1866, the United States exercised extraterritorial jurisdiction over Surratt and returned him to the United States from Alexandria, Egypt, where he had fled.

For over 100 years, the U.S. Supreme Court has consistently approved of the irregular method of rendition. The Ker-Frisbie doctrine is the linchpin of judicial approval for the abduction method of irregular rendition. The doctrine, fashioned together by the holdings of two separate Supreme Court cases, states that forcible abductions as a method of arresting and returning fugitives from a foreign land will not bar U.S. courts from asserting jurisdiction when the accused finally appears before them. Despite its potentially controversial premise, the Ker-Frisbie doctrine has been followed consistently by both state and federal courts.

The emergence of irregular rendition as a preferred method for returning accused and indicted criminals from abroad to stand trial in the United States stemmed from the rise in two categories of crime which presented unique and real dangers to U.S. national security beginning in the 1970s: terrorism and the trafficking of illegal narcotics. Despite the fact that extradition treaties were refined and expanded to keep pace with changing crime trends, the U.S. Government found itself stymied at times by an exception to extradition law known as the "political offense exception." This clause, included in all U.S. extradition treaties as well as most other extradition treaties currently in force, circumscribes extradition in cases involving politically motivated crimes and prosecutions. Unfortunately, the exception in its purest form makes no distinction between statesmen advocating change through words and terrorists inciting change through bombs.

As the 1970s gave way to the 1980s, federal law enforcement agents were faced with the difficult choice of either following the customary extradition process and taking the chance that terrorists and drug traffickers would avoid prosecution for their crimes, or bypassing traditional legal channels by obtaining physical custody of fugitives through means of irregular rendition.

U.S. law enforcement agents have exercised the irregular rendition method of fugitive capture in several different ways. They have worked directly with foreign agencies to apprehend fugitives abroad and transport them to the United States (sometimes via third countries); lured fugitives to U.S. territory, international waters, or to other countries from which their renditions can be more readily obtained; and have relied on private agents (such as bounty hunters and informants) to accomplish many of the same tasks.